# UNITED STATES DISTRICT COURT

# DISTRICT OF SOUTH DAKOTA

# SOUTHERN DIVISION (Sioux Falls)

**Stephen G. Olita,**
**Pro Se Plaintiff,**
**v.**
**Enertech Global, LLC, et al.,**
**Defendants.**

**Civil Action No.** 26-4154

Enertech Global, Amanda Christensen; Maurice Powers; Kevin Schrank; Kevin Weis;

Dylan O'Keefe; Jesse Shaw; Jill Lauchner; Robert Powers

## COMPLAINT, REQUEST FOR STATUS QUO RELIEF, AND REQUEST FOR PERMANENT INJUNCTION

(Jury Trial Demanded)

**UNITED STATES DISTRICT COURT**

**DISTRICT OF SOUTH DAKOTA**

**SOUTHERN DIVISION (Sioux Falls)**

**JS-44 Civil Cover Sheet**

| | |
|---|---|
| **Plaintiff(s):** | Stephen G. Olita, Pro Se Plaintiff, Orlando, FL |
| **Defendant(s):** | Enertech Global, LLC; Amanda Christensen; Maurice Powers;<br>Kevin Schrank; Kevin Weis; Dylan O'Keefe; Jesse Shaw; Jill Lauchner; Robert Powers |
| **County of Residence of First Listed Plaintiff:** | Orange County, FL |
| **County of Residence of First Listed Defendant:** | Davison County, SD |
| **Basis of Jurisdiction:** | ☒ Federal Question (28 U.S.C. § 1331) |
| **Cause of Action:** | Copyright Act (17 U.S.C. § 501); DTSA (18 U.S.C. § 1836); DMCA (17 U.S.C . § 1201) |
| **Nature of Suit:** | 820 – Copyright; 840 – Trademark; 890 – Other Statutory Actions |

| | |
|---|---|
| **Requested in Complaint:** | ☒ Jury Trial ☒ Damages ☒ Injunctive Relief |
| **Related Cases:** | None known |
| **Signature:** | Stephen G. Olita Date: 8/12/2026 Stephen G. Olita 8/12/2026 |

# I. JURISDICTION AND VENUE

1. This action arises under federal law, including the Copyright Act (17 U.S.C. § 501 et seq.), the Defend Trade Secrets Act (18 U.S.C. § 1836 within the Economic Espionage Act), and the Digital Millennium Copyright Act (17 U.S.C. § 1201 et seq.).

2. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1338.

3. Venue is proper in Sioux Falls because Defendants conduct business here and relevant events occurred here.

This Court has personal jurisdiction over Defendant Enertech Global, LLC because it maintains manufacturing operations in Mitchell, South Dakota and committed acts of infringement and misappropriation within this District.

This Court has personal jurisdiction over Defendants Maurice Powers, Robert Powers, and Jesse Shaw because, while residing in Greenville, Illinois, Maurice Powers directed and supervised, and Robert Powers and Jesse Shaw participated in, infringing activities occurring at Enertech's Mitchell, South Dakota facility, thereby purposefully availing themselves of the privilege of conducting business within this District.

Venue is proper under 28 U.S.C. § 1391(b) and (c) because a substantial portion of the events giving rise to this action occurred in this District. The geothermal manufacturing

operations, production-line activities, testing procedures, and IPCS-related conduct underlying Plaintiff's claims occurred primarily at Enertech's Mitchell, South Dakota facility.

## II. PARTIES

4. Plaintiff Stephen G. Olita is an individual residing in Orlando, Florida.

5–10. Defendants include Enertech Global, LLC, a limited liability company engaged in the manufacture of geothermal heating and cooling equipment. Its principal place of business and corporate headquarters are located in Greenville, Illinois, and it operates manufacturing facilities in Mitchell, South Dakota. Upon information and belief, Enertech Global, LLC operates as a subsidiary of NIBE Industrier AB (Sweden). The remaining defendants are individuals associated with Enertech Global, LLC's operations in Greenville, Illinois, and Mitchell, South Dakota.

## III. FACTUAL BACKGROUND

14. Plaintiff created and owns the Integrated Process Control System ("IPCS"), a proprietary manufacturing-control platform used by HVAC/R manufacturers and comprising software, engineering drawings, confidential manufacturing processes, HVAC/R product testing procedures, ERP-integration methodologies, quality-control

systems, and related intellectual property used by Enertech in its manufacturing operations. IPCS comprises proprietary copyrighted control algorithms implemented in more than 27 million lines of software code that control Plaintiff's proprietary engineered configuration and interconnection of more than 1,300 unique electronic components into an industrial system occupying thousands of square feet of manufacturing floor space and used in HVAC/R manufacturing environments. After determining the need for an additional IPCS Production Line, Enertech undertook a collaborative development and implementation effort with Serv-I-Quip and Epicor to replicate functionality embodied within Plaintiff's IPCS technology. Plaintiff is informed and believes that the new system not only duplicated IPCS-derived functionality, geothermal test procedures, ERP-integration logic, and manufacturing processes developed by Plaintiff, but that such duplication occurred without adherence to recognized Clean Room protocols. Clean Room protocol is a recognized engineering and legal standard used to prevent intellectual-property contamination during independent development of systems performing equivalent functionality. Such protocols require separation between individuals possessing knowledge of the protected system and personnel responsible for development and implementation of a system performing equivalent functionality.

**Stephen G. Olita Has Developed Highly Technical Product Solutions for HVAC-R Manufacturers**

Mr. Olita has spent decades developing advanced product solutions for the heating, ventilation, air conditioning, and refrigeration ("HVAC-R") industry. His responsibilities have included:

1. Researching and developing novel products as an inventor, author, and developer;

2. Overseeing the manufacture and sale of ECI's existing HVACR products;

3. Directing marketing efforts to expand the customer base to include untapped HVACR manufacturing firms; and

4. Through these efforts, Mr. Olita continued the development and expansion of the Integrated Process Control System ("IPCS"), a proprietary manufacturing-control platform first introduced in 1992. IPCS was originally developed to improve manufacturing quality control, process verification, safety compliance, and production-data collection within HVACR manufacturing environments.

5. Over more than three decades, IPCS was incrementally enhanced to accommodate advances in manufacturing and information technology, including networked Ethernet-based industrial controls, smart instrumentation, ERP integration, automated production tracking, electronic work instructions, serial-number traceability, and increasingly sophisticated HVACR products incorporating embedded intelligence and digital controls. Rather than a single software application, IPCS evolved into a comprehensive

manufacturing-control platform comprising proprietary software, databases, industrial-control technologies, test systems, and reporting tools. Collectively, these technologies encompass more than twenty-seven million lines of software code and control proprietary industrial systems, electronic assemblies, instrumentation, and test technologies developed by Mr. Olita. The IPCS platform configures and interconnects more than 1,300 unique electronic components into proprietary manufacturing systems that occupy thousands of square feet of manufacturing floor space, reflecting the substantial scope and complexity of IPCS.

6. In 2026, Mr. Olita further advanced IPCS through the introduction and marketing of Panacea and its patented RealityPV ("Reality Production Vision") technology, which extended IPCS's capabilities by integrating visual process control, real-time operational visibility, and TAKT-time-centric manufacturing oversight. These enhancements represented the latest stage in IPCS's continuing evolution and were built upon the same foundational manufacturing-control architecture that had been developed and refined since 1992. In 2014 Mr. Olita provided IPCS to Enertech Global, LLC for limited operational use within its manufacturing facilities.

7. For more than forty years, Mr. Olita has developed highly technical product solutions designed to assist HVACR manufacturers with the manufacture, assembly, testing, and processing of heating and cooling equipment. His innovations have focused on improving

quality control and safety procedures to ensure that HVACR products meet required performance and reliability standards before shipment to consumers.

8. Plaintiff relied on IPCS licensing income as the primary source of household support for himself and his spouse. The abrupt termination of that income, while Defendants allegedly continued to benefit from IPCS-derived functionality without compensation to Plaintiff, imposed significant and immediate financial hardship upon Plaintiff's household.

9. The software developed by Mr. Olita for his products comprises more than twenty-seven million lines of program code. This code uniquely operates and coordinates over three tons of physical industrial components that, when fully assembled, occupy thousands of square feet of manufacturing floor space at HVACR facilities. The integrated system combines software and over 1,300 electronic components to implement precise process control, ensuring error-free operation of manufacturers' units and mandating compliance with established quality-control and safety standards.

10. Mr. Olita has developed a comprehensive suite of proprietary software products that are copyright-protected and registered with the U.S. Copyright Office. These products are integrated and uniquely interoperable with the mostly-physically immovable industrial assemblies known as "Monuments," which enable their operation within HVACR manufacturing environments. Mr. Olita branded this product solution for the HVACR industry as the Integrated Process Control System ("IPCS"), which, when fully combined, comprises seventy-two (72) distinct IPCS modules and components.

11. The Integrated Process Control System ("IPCS") may be acquired from Mr. Olita in its entirety—that is, all seventy-two (72) modules and components comprising the IPCS—or, depending on a manufacturer's specific production requirements, selected IPCS modules may be licensed or provided individually for integration within the manufacturer's existing operations.

12. The IPCS modules and components, individually and in combination, were engineered by Mr. Olita to make it virtually impossible for an HVACR manufacturer to ship a product that fails to meet required performance or safety specifications. The IPCS enforces compliance with critical metrics such as BTU heating and cooling capacity ratings, SEER energy-efficiency ratings, and operational safety parameters. Through its integrated process-control architecture, IPCS ensures that every manufactured unit conforms to established standards before releasing to consumers.

13. The IPCS system serves to enforce and verify compliance with industry standards developed by the Air Conditioning, Heating, and Refrigeration Institute ("AHRI"), Underwriters Laboratories ("UL"), and Occupational Safety and Health Administration ("OSHA") safety requirements. IPCS has been implemented, in whole or in part, by numerous HVAC/R manufacturers and production facilities throughout the industry. Through its various modules, functions, and components, IPCS has supported manufacturing-control operations, testing procedures, quality-control requirements, traceability functions, compliance-gating processes, ERP-integration methodologies, and related manufacturing activities across multiple HVAC/R manufacturing environments. IPCS has been utilized by industry-leading manufacturers, including United Technologies

Carrier Corporation, Lennox Industries International, Nortek Global HVAC, Rheem Manufacturing Company, and Johnson Controls, Inc. (York), among others.

14. Defendant Enertech Global, LLC operates within the HVACR manufacturing industry, producing geothermal heating and cooling products for residential and commercial applications. Enertech was an IPCS customer and utilized Mr. Olita's proprietary software, drawings, and process-control instrumentation in its manufacturing operations. After termination of its authorized use, Enertech continued employing and duplicating IPCS materials without permission, resulting in ongoing infringement and misappropriation.

15. In the weeks preceding the events described herein, Plaintiff became increasingly concerned by a series of irregular occurrences involving IPCS, including unauthorized configuration changes, unexplained activity involving KeyLok-protected data, and other circumstances that caused Plaintiff to question whether IPCS technology was being accessed or utilized in an unauthorized manner. Plaintiff communicated these concerns to Enertech personnel, including Defendants Kevin Schrank and Maurice Powers, and advised that he wished to visit Enertech's Mitchell, South Dakota facility to personally inspect the IPCS Production Line and better understand the circumstances giving rise to his concerns.

16. Following Plaintiff's expression of these concerns, a series of communications occurred between Plaintiff and Enertech personnel concerning Plaintiff's proposed visit and the issues he had identified. Plaintiff alleges that the responses he received failed to

resolve his concerns and instead increased his suspicion that material facts concerning Enertech's use of IPCS technology were being withheld from him. Within days of these communications, Plaintiff learned that Enertech had decommissioned the IPCS Production Line and transitioned production to an additional manufacturing system, thereby preventing Plaintiff from directly observing the operational status of the IPCS Production Line and the surrounding circumstances.

17. On July 14, 2026, Mr. Olita learned that Enertech Global had decommissioned his IPCS Production Line and migrated production to an additional manufacturing system that, based upon its functionality, timing, and ability to perform equivalent geothermal testing, ERP-integration, quality-control, and production-processing operations, necessarily at least in part incorporates unauthorized replication of Plaintiff's intellectual property.

18. Enertech's new geothermal testing platform performs IPCS-specific test sequences, test procedures, ERP integration logic, and stored-procedure interfaces that were developed exclusively by Mr. Olita over many years. The speed and completeness of Enertech's immediate transition demonstrate that both systems existed simultaneously and were functionally equivalent, strongly indicating that the functionality embodied within the new system was developed with access to IPCS-derived information and that recognized Clean Room protocols were not followed. Given the one-day transition from the IPCS Production Line to a fully integrated and operational geothermal manufacturing platform performing equivalent testing, ERP-integration, quality-control, and production-processing functions, Plaintiff alleges that the development effort necessarily involved access to detailed knowledge of IPCS-controlled operations and could not have been

accomplished through an independent development process insulated from such knowledge, as required to satisfy recognized Clean Room protocol and as further explained in Paragraph 19. Plaintiff further alleges that, through decades of incremental development and implementation across multiple HVAC/R manufacturing environments, IPCS came to embody the testing procedures, quality-control requirements, traceability controls, U.S. and international certification-related processes, warranty-support functions, and other highly structured manufacturing and compliance requirements required throughout the HVAC/R industry. Those capabilities were not developed by Enertech but instead derive from Plaintiff's proprietary intellectual property, including patented technologies, copyrighted software and documentation, confidential manufacturing methodologies, and trade secrets developed over many years. The ability to transition production from the IPCS Production Line to the replacement system within a single day reasonably indicates that the replacement system had already implemented substantially the same operational functionality required to satisfy those existing manufacturing requirements. Because the replacement system was capable of immediately performing the same highly structured manufacturing, testing, ERP-integration, quality-control, traceability, and compliance-related functions previously performed by IPCS, Plaintiff alleges that the development effort could not have satisfied the separation and insulation requirements of recognized Clean Room protocol, as further explained below.

19. Clean Room protocol is a recognized engineering and legal standard used to prevent intellectual-property contamination during independent development of systems performing equivalent functionality. It requires two isolated teams—one documenting functionality without accessing proprietary code, and another independently developing a system performing equivalent functionality without exposure to the original IP. Any deviation eliminates Clean Room protection and constitutes direct exposure to protected intellectual property. Given the one-day transition and the fully integrated geothermal testing platform deployed on July 15, the Clean Room protocol could not have been followed.

20. Enertech's geothermal IPCS Production Line originates from Mr. Olita through a long-standing chain of custody. In 2014, Mr. Olita spent forty-five consecutive days on-site at Enertech's Mitchell, South Dakota facility performing the full implementation of the Olita IPCS Production Line. Prior to that, Mr. Olita had provided geothermal testing procedures and IPCS products to Econar, whose geothermal product line was later acquired by Enertech in 2014. With that acquisition, Enertech inherited the Olita IPCS Production Line and associated equipment. Mr. Olita continued maintaining and expanding those procedures for both the inherited Econar products and Enertech's geothermal models. The geothermal test sequences now operating within Enertech's

geothermal manufacturing environment therefore derive directly from Mr. Olita's intellectual property, not from independent development.

21. Plaintiff is informed and believes that Serv-I-Quip possessed no independent chain of custody to the geothermal manufacturing test procedures, production logic, quality-control checkpoints, and product-specific validation methods developed over decades for the Econar and later Enertech geothermal product lines. Plaintiff further alleges that successful implementation of the geothermal production-line expansion therefore required substantial participation by Enertech personnel possessing detailed knowledge of the IPCS-derived geothermal manufacturing processes, test sequences, and incremental advancements developed and implemented throughout the parties' longstanding relationship.

22. Plaintiff is informed and believes that no single participant in the implementation effort to reproduce IPCS-derived functionality possessed the full range of technical knowledge embodied within IPCS, which encompasses multiple specialized disciplines beyond the ordinary scope of expertise of any one participant, and that successful reproduction of IPCS-derived functionality therefore required coordinated participation by Enertech personnel together with Serv-I-Quip and Epicor.

23. Plaintiff is informed and believes that Enertech's newly implemented geothermal manufacturing system appears to implement ERP-integration functions that Serv-I-Quip does not advertise or document as part of its capabilities. Enertech's geothermal

production requires work-order and Bill-of-Materials ingestion, key-component serial-number recording and model-number verification, real-time inventory-relief functionality, compliance gating, shipment authorization, and PackOut Watchdog-equivalent blocking functionality. Neither Serv-I-Quip nor Epicor provides functionality equivalent to the IPCS Production Line's PackOut Watchdog—the compliance gate preventing shipment of any unit lacking required IPCS test data. If Enertech's newly implemented geothermal manufacturing system implements equivalent gating, it represents direct use of Mr. Olita's intellectual property.

24. PackOut Watchdog, designated by Enertech as the 'Final' station and serving as the final shipment-authorization and compliance-gating operation within the IPCS Production Line, verifies that all required manufacturing, testing, quality-control, and ERP integration requirements have been successfully completed before permitting release of a unit.

Among other functions, it confirms that all components consumed during manufacture have been properly relieved from inventory and associated with the unit's final Bill of Material, preserving component traceability, vendor accountability, and warranty-support records. PackOut Watchdog further verifies successful completion of refrigeration-system leak testing, confirmation of the correct refrigerant type and charge weight, electrical-safety validation through integrated HiPot and AutoTest processes, and verification that the unit operates properly in all required functional modes. Upon successful completion of these requirements, PackOut Watchdog authorizes shipment, generates the required customer documentation, prints applicable operating manuals and regulatory labeling, records final production status, and transitions the completed geothermal unit into

finished inventory or a specific customer order. Absent successful completion of these requirements, PackOut Watchdog prevents shipment and blocks release of the unit.

25. The IPCS Production Line consists of multiple IPCS-controlled operations implemented across dedicated production-line computers that collectively perform manufacturing-control, testing, quality-control, ERP-integration, compliance-gating, traceability, reporting, and shipment-authorization functions. Plaintiff is informed and believes that functionality associated with one or more of the following IPCS-controlled operations was reproduced within Enertech's geothermal manufacturing environment:

(1) AutoTest West Consumer Safety and Cooling and Heating Performance Test;

(2) AutoTest East Consumer Safety and Cooling and Heating Performance Test;

(3) LeakProof Refrigerant Coil Safety Burst Prevention Integrity and Helium Leak Test, and Water Coil Leak Test;

(4) VacuCharge West Evacuation and Refrigerant Charging;

(5) VacuCharge East Evacuation and Refrigerant Charging;

(6) Key Component Compressor L-1 Bill of Material Match and Serial Number Recording;

(7) Key Component Electrical L-1 Bill of Material Match and Serial Number Recording;

(8) Key Component Compressor L-2 Bill of Material Match and Serial Number Recording;

(9) Key Component Air Coil L-2 Bill of Material Match and Serial Number Recording;

(10) Key Component Electrical L-2 Bill of Material Match and Serial Number Recording;

(11) Enertech Unit IPCS Report Card Excel File Creation;

(12) Key Component Final Assembly PackOut Watchdog;

(13) Key Component Electrical Wiring Sub-Assembly Control Box Wiring Instructions;

(14) Key Component Refrigeration Sub-Assembly Bill of Material Match and Serial Number Recording;

(15) Key Component Air Coil L-1 Bill of Material Match and Serial Number Recording;

(16) Key Component Spray Booth; and

(17) Final Refrigerant Leak Test.

26. Plaintiff further alleges that successful implementation of the IPCS-derived functionality required detailed knowledge of the IPCS-controlled operations identified in Paragraph 25, including work-order ingestion, Bill-of-Materials extraction, serial-number verification, model-validation procedures, inventory-relief functionality, compliance gating, shipment authorization controls, and PackOut Watchdog-equivalent production safeguards that had been developed and refined through IPCS over many years. Plaintiff is informed and believes that such knowledge was supplied through the participation of Enertech personnel possessing firsthand familiarity with the IPCS Production Line and its incremental advancements and not through any independent chain of custody originating with Serv-I-Quip or Epicor.

27. Plaintiff further alleges that implementation of the IPCS-derived functionality required participation by Enertech personnel possessing specialized knowledge concerning the IPCS-controlled operations identified in Paragraph 25. Plaintiff is informed and believes that Maurice Powers and Jesse Shaw possessed detailed knowledge concerning work-

order ingestion, Bill-of-Materials extraction, ERP integration, inventory-relief functionality, shipment authorization controls, and PackOut Watchdog-related ERP processes. Kevin Weis possessed detailed knowledge concerning IPCS electrical-validation systems, wiring schematics, control-signal architecture, AutoTest functionality, and model-verification procedures. Kevin Schrank and Dylan O'Keefe possessed detailed knowledge concerning geothermal test sequences, production-line workflow, quality-control checkpoints, compliance-gating requirements, refrigeration-system validation, and final production-release criteria. Amanda Christensen was granted access to IPCS test procedures, configurations, datasets, and other supervisory-level IPCS functionality. Plaintiff further alleges that the combined knowledge of these individuals encompassed the operational requirements necessary to reproduce functionality associated with the IPCS-controlled operations identified in Paragraph 25 and incorporated into Enertech's geothermal manufacturing environment.

28. Mr. Olita also developed the stored-procedure interfaces used to extract ERP data from Syteline and later Epicor and unwittingly incrementally provided Enertech with those specifications during the years-long implementation and integration of IPCS-derived functionality within Enertech's geothermal manufacturing environment. That reuse, duplication, or derivative implementation of these procedures by Enertech, Epicor, or Serv-I-Quip constitutes unauthorized use of Mr. Olita's intellectual property.

29. Since implementation of the IPCS Production Line in 2014, Enertech incorporated successive IPCS enhancements developed by Mr. Olita, including advancements in manufacturing controls, instrumentation, ERP integration, production-data collection,

reporting, and process-verification functionality. Plaintiff is informed and believes that Enertech implemented substantially all IPCS developments provided during the parties' relationship, with the exception of the most recent enhancements, including Panacea and certain smart-control-board interfacing technologies. This pattern of implementation demonstrates Enertech's continuing reliance upon and acceptance of IPCS technology and its ongoing evolution.

30. Plaintiff's IPCS software is protected by a KeyLok USB hardware dongle, a technological measure that effectively controls access to the copyrighted software within the meaning of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1201(a)(1). The software cannot run without the dongle, and all configuration changes require entry of Plaintiff's supervisory-level credentials.

31. Plaintiff's KeyLok-based DRM system serves not only as an access-control mechanism for IPCS software, but also as a licensing and authorization system controlling expansion of IPCS-controlled manufacturing operations. Manufacturers may license selected IPCS-controlled operations identified in Paragraph 25 rather than the entire IPCS platform. When a manufacturer desires to add a new IPCS-controlled operation or replicate an existing IPCS-controlled operation, such as an additional AutoTest station, the manufacturer must acquire from Plaintiff the corresponding IPCS-authorized hardware, software, and KeyLok authorization necessary to enable operation of that functionality. Absent the DRM protections described herein, a manufacturer possessing IPCS drawings, system configurations, and software could reproduce Plaintiff's proprietary manufacturing-control functionality without purchasing the corresponding IPCS-authorized components,

licensing rights, and ongoing licensing services, thereby depriving Plaintiff of both equipment revenue and continuing licensing income. Plaintiff further alleges that circumvention of the DRM protections described herein would enable unauthorized reproduction, derivation, implementation, commercialization, or exploitation of IPCS-controlled functionality through an alternative platform without acquiring the corresponding IPCS-authorized components, licensing rights, and continuing licensing services, as further explained in Paragraph 32.

32. Plaintiff further alleges that reproduction of IPCS-derived functionality through an alternative platform does not require duplication of the underlying platform, programming language, industrial-control technology, software architecture, communications methodology, operator interface, proprietary configured and interconnected systems, or other implementation technologies. Functionality associated with the IPCS-controlled operations identified in Paragraph 25 may be reproduced through alternative platforms, including PLC-based platforms, PC-based platforms, distributed-control platforms, industrial-control platforms, or other implementation technologies performing equivalent functionality. Plaintiff therefore alleges that use of a different platform, different programming methods, different communications methodologies, different control technologies, different operator interfaces, or different implementation technologies does not establish independent development and does not satisfy recognized Clean Room protocol. Plaintiff further alleges that, even if the disputed manufacturing system utilizes a platform different from IPCS, such difference does not establish independent

development and does not preclude reproduction, derivation, implementation, commercialization, or exploitation of IPCS-derived functionality. The relevant inquiry is whether the disputed manufacturing system reproduces, derives from, or implements functionality, manufacturing processes, testing methodologies, ERP-integration logic, compliance-gating functions, traceability functions, reporting structures, shipment-authorization processes, and other intellectual-property elements originating from IPCS technology. Plaintiff further alleges that the ability of different platforms to implement equivalent functionality is the reason recognized Clean Room protocol focuses upon separation of knowledge and development personnel rather than upon the particular platform selected for implementation. Whether the disputed manufacturing system utilizes a platform different from IPCS is therefore not determinative of independent development. The relevant question is whether the functionality embodied within the disputed manufacturing system derives from independent development or instead originates from knowledge, methodologies, processes, functionality, and intellectual-property elements originating from IPCS technology.

33. During a remote troubleshooting session in late June 2026, Plaintiff and Enertech employee Jesse Shaw observed a “surgical edit” to the IPCS IP-address configuration despite the KeyLok-protected access controls and supervisory-credential requirements described in Paragraph 30. Shaw noticed the change first; Plaintiff, who was viewing the

same screen via remote connection, initially missed it. The edit was not part of any troubleshooting procedure and could only have been made by a user who had bypassed the access-control protections governing configuration changes.

34. The unauthorized edit required illicit access to Plaintiff's encrypted supervisory password and username, which Enertech personnel could only have obtained by circumventing the KeyLok-protected access controls. This circumvention constitutes bypassing a technological measure that controls access to a copyrighted work, in violation of the DMCA, 17 U.S.C. § 1201(a)(1) and § 1201(a)(2).

35. The purpose of the IP address configuration edit was not functional. Instead, it was a ruse to divert Plaintiff's attention and keep him engaged and unsuspecting while other Enertech personnel continued to duplicate the IPCS Technology. The timing and nature of the edit demonstrate that it was performed to facilitate and conceal that on-going effort. Plaintiff further alleges that this incident contributed to his growing concerns regarding unauthorized access to and use of IPCS technology and forms part of the sequence of events described herein that ultimately led Plaintiff to seek inspection of the IPCS Production Line.

36. In addition to the circumvention observed during the Jesse Shaw remote troubleshooting session, Plaintiff later discovered a second pattern of unauthorized access involving Enertech's manipulation of the KeyLok-protected data. Plaintiff had previously identified recurring corruption of the USB dongle's encrypted key data, caused

when Enertech operators inadvertently launched multiple instances of the IPCS application from a desktop shortcut. Plaintiff routinely repaired this corruption remotely, often weekly. However, beginning in mid-2026, Enertech ceased requesting assistance. When Plaintiff inquired by text message, Enertech employee and co-defendant Kevin Schrank responded, “Are you getting suspicious?” Plaintiff had recently provided a new desktop batch-file shortcut to Robert Powers, an Enertech IT technician, to prevent multiple-instance launches. Several days later, Enertech’s Maurice Powers emailed Plaintiff stating that key-data corruption was still occurring, even though Plaintiff had not performed any repairs using the troubleshooting remote connection. Plaintiff alleges that Robert Powers, acting within Enertech’s IT department, illicitly accessed the encrypted supervisory password and user credentials to repair the corrupted key data himself, thereby circumventing the KeyLok access-control system in violation of 17 U.S.C. § 1201(a)(1) and (a)(2). This conduct constitutes a second, multiple-occurring independent act of circumvention under the DMCA.

37. Plaintiff is informed and believes that Robert Powers never deployed or implemented the corrective batch-file shortcut despite its purpose of eliminating the known cause of key-data corruption. Had the shortcut been implemented, the recurring corruption events should have been substantially reduced or eliminated. Plaintiff alleges that the failure to deploy the corrective measure is circumstantial evidence that Robert Powers had an alternative means of addressing the corruption and was independently repairing the encrypted key data through access to Plaintiff's protected supervisory credentials and KeyLok-protected systems. Plaintiff further alleges that this conduct is consistent with and

supports the inference that Mr. Powers had already obtained unauthorized access sufficient to circumvent the technological protection measures protecting IPCS.

38. Plaintiff further asserts that the recurring key-data corruption was not a shortcoming of the IPCS software or its KeyLok protection. The same keys had operated without issue since 2014, demonstrating their reliability. The corruption arose from Enertech's IT practices—specifically, imposing excessive processing burdens on outdated PCs and failing to upgrade operating systems. Operators, frustrated by slow load times, would launch multiple instances of the application, resulting in KeyLok key-communication collisions that triggered the corruption. Importantly, the physical keys themselves were never damaged or replaced, confirming that the underlying protection system remained intact and that the fault lay with the operator's impatience and Enertech's IT practices, not with Plaintiff's technology.

39. Plaintiff alleges that Enertech's conduct required bypassing the technological protection measures that the DMCA was enacted to safeguard, including Plaintiff's KeyLok-based DRM system, Company-specific authorization controls, encryption-protected configuration layers, and supervisory-credential gates. These circumventions were not isolated incidents but occurred repeatedly over an extended period, demonstrating a continuing pattern of unauthorized access to Plaintiff's protected IPCS software. Enertech's personnel, including IT staff and operators, engaged in multiple acts of circumvention to manipulate encrypted data and configuration parameters, each time

defeating the KeyLok access-control system that Congress designed § 1201 to protect. This repeated conduct underscores the willful and systematic nature of Enertech's violations of the DMCA.

40. Plaintiff further alleges that Robert Powers' apparent failure to deploy the corrective batch-file shortcut, despite receiving it specifically to eliminate the recurring corruption events, is additional circumstantial evidence that he had already obtained unauthorized access sufficient to repair the encrypted KeyLok-protected data independently, thereby supporting the inference of repeated circumvention conduct alleged herein.

41. Plaintiff alleges that Defendants engaged in multiple acts of circumvention of technological protection measures in violation of the DMCA, resulting in unauthorized access to and use of Plaintiff's protected IPCS software and related technologies. Plaintiff therefore seeks statutory damages, actual damages, injunctive relief, and all remedies available under 17 U.S.C. § 1203.

# IV. CAUSES OF ACTION

## COUNT I — Copyright Infringement (17 U.S.C. § 501)

17–41. Defendants reproduced, distributed, and used Plaintiff's copyrighted works without authorization. Plaintiff seeks statutory and actual damages, injunctive relief, and disgorgement under § 504.

## COUNT II — Misappropriation of Trade Secrets (18 U.S.C. § 1836, DTSA)

17–41. Plaintiff brings this claim under the Defend Trade Secrets Act, the civil cause of action within the Economic Espionage Act. Defendants acquired and used Plaintiff's trade secrets through improper means. Plaintiff seeks damages, exemplary damages, injunctive relief, and disgorgement.

## COUNT III — Circumvention of Digital Rights Management and Technological Protection Measures Under the DMCA (17 U.S.C. § 1201)

30–41. Plaintiff incorporates by reference Paragraphs 30 through 41 as though fully set forth herein. Defendants bypassed, defeated, or otherwise circumvented technological protection measures protecting Plaintiff's copyrighted IPCS software, including Plaintiff's KeyLok-based Digital Rights Management ("DRM") system, consisting of a KeyLok USB hardware dongle containing Company-specific authorization data, encrypted supervisory credentials, and access-control restrictions that effectively controlled access to copyrighted works within the meaning of the DMCA, 17 U.S.C. § 1201(a)(1). These

technological measures incorporated Company-specific authorization data, encrypted credentials, and access-control mechanisms designed to prevent unauthorized execution, modification, configuration changes, and access to Plaintiff's protected IPCS software. The DRM system further incorporated Company-specific authorization controls intended to prevent unauthorized copying, distribution, commercialization, licensing, or use of IPCS software and related technologies outside the scope of Plaintiff's authorization. Defendants further engaged in unauthorized access, manipulation of protected configuration data, circumvention of encrypted access controls, and other acts defeating the technological protection measures described in Paragraphs 30 through 41. Such conduct is independently prohibited by the DMCA regardless of whether the same conduct also constitutes copyright infringement. Plaintiff alleges that Defendants' repeated circumvention activities enabled unauthorized access to Plaintiff's protected IPCS software and related technologies in violation of 17 U.S.C. § 1201(a)(1) and § 1201(a)(2). Plaintiff therefore seeks statutory damages, actual damages, disgorgement of profits, injunctive relief, and all other remedies available under 17 U.S.C. § 1203.

## V. OWNERSHIP OF INTELLECTUAL PROPERTY

4–29. Plaintiff owns all rights, title, and interest in the IPCS software, drawings, and trade secrets, including by assignment.

# VI. DAMAGES AND DISGORGEMENT

41 and elsewhere herein: Plaintiff seeks statutory, actual, and exemplary damages and disgorgement of profits under 17 U.S.C. § 504(b), 18 U.S.C. § 1836(b)(3), and 17 U.S.C. § 1203.

# VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that the Court grant the following relief:

Plaintiff respectfully requests that the Court, in maintaining the status quo between the parties, order Enertech Global, LLC to resume the monthly $5,000 payment to Plaintiff during the pendency of this action. Plaintiff submits that such payment represents equitable consideration for Enertech's continued use of IPCS technology and ensures that both parties remain in their respective pre-litigation positions until final adjudication. This measure would preserve operational continuity for Enertech while preventing undue financial hardship to Plaintiff, thereby maintaining balance and fairness throughout the proceedings.

Plaintiff further clarifies that the requested $5,000 monthly payment is intended solely to maintain the status quo between the parties during the pendency of this action and shall not be construed as satisfaction, offset, or waiver of any damages, profit disgorgement, or

other monetary relief to which Plaintiff may be entitled upon final judgment. Plaintiff respectfully submits that this interim measure reflects the financial hardship imposed by Enertech's continued use of IPCS technology without compensation and underscores Plaintiff's urgent need for equitable relief pending trial.

Plaintiff further submits that, prior to the events giving rise to this action, Enertech maintained payments in advance of ongoing IPCS operations in order to avoid interruption of manufacturing activities in the event of payment-processing delays or administrative issues. Plaintiff alleges that this advance-payment arrangement constituted the parties' established course of dealing and reflects the status quo existing immediately prior to the present dispute. Plaintiff therefore requests that any status-quo relief ordered by the Court include restoration and maintenance of the parties' last undisputed pre-litigation payment position. Plaintiff further alleges that the last payment received from Enertech was made on June 15, 2026, and maintained the parties' established advance-payment position through August 15, 2026, reflecting the last undisputed pre-litigation payment status maintained by the parties. Plaintiff further alleges that the next payment required to maintain the parties' established advance-payment position became due on July 15, 2026. Plaintiff further alleges that, on that same date, Enertech notified Plaintiff that it was decommissioning the IPCS Production Line, declined to continue the advance-payment arrangement, and requested return of the prepaid portion attributable to the period following decommissioning. Plaintiff respectfully submits that these actions terminated the parties' longstanding advance-payment status quo and support restoration of the last undisputed pre-litigation payment position pending final adjudication. Plaintiff further

notes that the termination of the advance-payment arrangement occurred following the sequence of events described herein concerning Plaintiff's expression of concerns regarding unauthorized activity involving IPCS technology, Plaintiff's request to inspect the IPCS Production Line, and the communications that followed.

Should the Court decline to order the requested $5,000 monthly payment, Plaintiff respectfully requests, in the alternative, that the Court issue a temporary restraining order or other injunctive relief prohibiting Enertech Global, LLC from continued use of IPCS technology during the pendency of this action. Plaintiff submits that if the status quo cannot be maintained for both parties—where Enertech continues to benefit from IPCS technology while Plaintiff receives equitable compensation—then neither party should be permitted to do so. Such relief would prevent further unjust enrichment, preserve the integrity of the proceedings, and encourage prompt resolution of this matter.

In furtherance of maintaining the status quo and clarifying the scope of Enertech's ongoing conduct, Plaintiff respectfully requests that the Court issue a declaratory determination regarding Enertech Global, LLC's current use of IPCS technology. Plaintiff anticipates that

Enertech may assert it is not utilizing the IPCS Production Line or related systems and therefore not violating any proprietary rights.

To resolve this dispute of fact, Plaintiff requests that the Court require Enertech to produce evidence demonstrating nonuse, including but not limited to unit report cards for products tested on IPCS-derived systems, and to account for all physical and digital materials originating from Plaintiff's intellectual property, such as engineering drawings, Excel spreadsheets, software, databases, and other copyrighted or proprietary IPCS documentation, that have not been returned or removed from Enertech's systems. Plaintiff further alleges that such unit report cards continue to serve warranty-support, product-service, traceability, compliance-verification, and manufacturing-record functions and therefore may constitute ongoing use of IPCS-derived reporting structures, trade-secret methodologies, integration logic, and related intellectual property. Plaintiff further alleges that the generation, organization, and presentation of such reports incorporate proprietary reporting methodologies, data structures, ERP-integration logic, and trade-secret processes developed by Plaintiff through decades of IPCS implementation across multiple HVAC/R manufacturing environments. Continued use of such materials constitutes ongoing and irreparable harm because the proprietary methodologies, reporting structures, and trade-secret processes embodied therein continue to provide operational value within Enertech's manufacturing, quality-control, field-service, and warranty-support activities. Should Enertech provide a verified declaration asserting complete nonuse and removal of all IPCS-related materials, such declaration shall not serve to clear Enertech of intellectual-property theft, as the IPCS technology remains in duplicated form and in active

use on the disputed manufacturing system. Such declaration would ensure transparency, prevent selective disclosure, and confirm whether Enertech's operations remain dependent upon IPCS technology during the pendency of this action.

Plaintiff further requests that Enertech Global, LLC be required to state whether it contends that recognized Clean Room protocols were utilized in connection with the development, implementation, or integration of the disputed manufacturing system and any related Epicor or Serv-I-Quip activities. If Enertech contends that such protocols were utilized, Plaintiff further requests that Enertech identify the personnel involved, describe the procedures employed, and produce documentation sufficient to demonstrate compliance with those protocols. If Enertech contends that such protocols were not utilized, Plaintiff requests that Enertech so state in a verified declaration so that the issue may be appropriately narrowed for purposes of discovery and trial. Plaintiff further submits that early identification of Enertech's position concerning Clean Room protocol is necessary to assist the Court in evaluating Plaintiff's requests for preliminary injunctive and declaratory relief and to prevent unnecessary delay concerning issues central to the parties' dispute.

Plaintiff further submits that immediate relief is warranted because Defendants' continued use of IPCS-derived functionality, trade-secret methodologies, reporting structures, ERP-integration logic, and related intellectual property constitutes actual or threatened misappropriation within the meaning of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §

1836(b)(3)(A)(i). Plaintiff further alleges that continued use of such functionality causes ongoing and irreparable harm that cannot be fully compensated through monetary damages alone, particularly where the disputed manufacturing system, warranty-support processes, traceability functions, and reporting structures continue to provide operational value to Defendants during the pendency of this action. Accordingly, Plaintiff respectfully requests that the Court exercise its authority under 18 U.S.C. § 1836(b)(3)(A) to preserve the status quo and prevent further irreparable harm pending final adjudication.

Plaintiff respectfully requests that, upon issuance of the foregoing relief, the Court proceed to adjudicate Plaintiff's claims for damages, profit disgorgement, costs, and any other equitable or legal remedies deemed just and proper under the circumstances.

Plaintiff respectfully requests judgment in his favor, damages, injunctive relief, costs, and any other relief deemed just and proper. Plaintiff respectfully requests that the Court enter a permanent injunction pursuant to
17 U.S.C. § 502, 18 U.S.C. § 1836(b)(3)(A)(i), and 17 U.S.C. § 1203(b)(1), enjoining Defendants, their officers, agents, employees, successors, and all persons acting in concert or participation with them from directly or indirectly using, copying, distributing, modifying, or otherwise exploiting any portion of Plaintiff's IPCS technology, software, test procedures, wiring schematics, or derivative works thereof. Plaintiff further requests that Defendants be permanently enjoined from purchasing, licensing, deploying, utilizing, marketing, promoting, selling, offering for sale, or otherwise commercially exploiting any production-line functionality, geothermal testing methodology, manufacturing process, quality-control procedure, ERP-integration process, reporting structure, shipment-authorization functionality, PackOut Watchdog-equivalent functionality, including functionality associated with the PackOut Watchdog, designated by Enertech as the "Final" station, or derivative technology incorporating, derived from, or based upon Plaintiff's IPCS technology, copyrighted works, trade secrets, confidential manufacturing processes, or related intellectual property.

Plaintiff further requests that the Court require Defendants to remove and destroy all unauthorized copies, derivative materials, and data derived (historical data) from IPCS, and to certify compliance with this injunction within thirty (30) days of the Court's order.

Plaintiff further requests that the Court prohibit Enertech Global, LLC from paying or reimbursing attorney fees, costs, or expenses incurred by the individual defendants named herein. The actions of these individuals were outside the scope of their employment and constitute willful infringement and misappropriation of Plaintiff's intellectual property.

Enertech's IT Director, Maurice Powers, requested and obtained Supervisory-level IPCS access rights for Amanda Christensen, an Electrical Assembler Lead—a production-level employee. The access granted allowed viewing copyrighted IPCS geothermal test procedures, editing proprietary configurations, downloading IPCS test-result datasets, and executing IPCS logic normally restricted to authorized OEM engineering teams. Such authorization was highly irregular and demonstrates deliberate misuse of Plaintiff's protected materials.

Further, Enertech management and technical personnel—including Jesse Shaw (ERP Integration / IT, Greenville IL), Kevin Schrank (QC Manager / Manufacturing Manager), Kevin Weis (Operations Engineer), Dylan O'Keefe (Supervisor), and Jill Lauchner (Director of Human Resources)—each engaged in or oversaw activities that raise serious questions regarding Clean Room compliance, ERP integration duplication, and unauthorized access to IPCS materials.

Jesse Shaw participated in the surgical editing of IP address configurations and ERP stored-procedure logic derived from IPCS, enabling unauthorized replication of Plaintiff's proprietary integration framework.

Kevin Weis used confidential IPCS wiring drawings and schematics to interpret and replicate control-signal architecture for Serv-I-Quip's geothermal test station.

Jill Lauchner, as Director of Human Resources, failed to document or enforce Clean Room separation requirements and permitted reassignment of production employees to IPCS-related tasks without compliance oversight.

Kevin Schrank and Dylan O'Keefe supervised or participated in duplicating IPCS-derived test sequences and production-line logic, contributing to the unauthorized transition to the Serv-I-Quip Production Line.

Plaintiff has documented inquiries directed to Enertech's personnel concerning these matters, including whether Clean Room protocols were implemented, who authorized bypassing separation requirements, and whether employees were informed that IPCS materials are copyrighted and require Clean Room handling. These documented irregularities indicate coordinated conduct beyond normal job responsibilities.

Plaintiff further requests that the Court require each individual defendant to obtain separate legal representation from independent law firms. Joint representation by counsel for Enertech Global, LLC would create inherent conflicts of interest and allow corporate management to influence or suppress testimony from subordinate employees. Independent counsel is necessary to ensure that each defendant's actions—including those of Maurice Powers, Amanda Christensen, Jesse Shaw, Kevin Schrank, Kevin Weis,

Dylan O'Keefe, and Jill Lauchner—are evaluated individually and without undue corporate pressure.

Plaintiff recognizes that separate representation may impose a financial burden on certain defendants. In such cases, Plaintiff respectfully submits that those individuals may elect to represent themselves, as Plaintiff has done due to financial constraints, thereby preserving their right to independent participation while avoiding corporate control over their defense. This accommodation ensures fairness to all parties and maintains the integrity of individual testimony without compromising the principle of independent representation.

Plaintiff further requests that, upon a finding of liability, each individual defendant be held personally responsible for their respective acts of infringement, misappropriation, and circumvention. Plaintiff seeks that the Court impose joint and several liability for damages, statutory penalties, and disgorgement of profits under
17 U.S.C. § 504(b), 18 U.S.C. § 1836(b)(3), and 17 U.S.C. § 1203, apportioned according to each defendant's role and participation.

Plaintiff further requests that, upon a finding of liability, each individual defendant be held personally responsible for their respective acts of infringement, misappropriation, and unauthorized use of IPCS technology. Plaintiff submits that personal accountability is

essential to deter future misconduct and to ensure that the individuals who participated in or directed the infringing activities are not shielded by corporate structure.

In addition, Plaintiff respectfully requests that, if the evidence establishes willful or knowing misappropriation of trade secrets, the Court consider referring this matter to the United States Department of Justice for review under the Economic Espionage Act, 18 U.S.C. § 1831 et seq. Plaintiff notes that the Economic Espionage Act specifically addresses the theft or misappropriation of trade secrets—confidential technical and business information that derives independent economic value from not being publicly known—which are among the proprietary materials at issue in this case. Plaintiff believes that the conduct alleged herein, if proven, may constitute criminal violations involving the theft or conversion of proprietary technology for commercial advantage. Plaintiff further recommends that such referral encompass not only Enertech Global, LLC and its individual defendants, but also Serv-I-Quip, Inc. and Epicor Software Corporation, whose collaborative activities with Enertech facilitated the unauthorized integration and use of IPCS-derived materials. This broader referral would ensure that all entities potentially implicated in the misappropriation are properly evaluated by the appropriate authorities.

Plaintiff further notes that the need for potential criminal referral persists regardless of any civil settlement that may be reached in this matter. The misappropriation of trade secrets within the HVAC industry is an endemic and recurring problem, as evidenced by prior federal litigation such as ECIMOS, LLC v. Carrier Corporation, where the Court found that

Carrier continued using protected intellectual property for nearly two years after entry of a permanent injunction, generating substantial revenue while relying on ECIMOS's proprietary run-test software and database in violation of court orders. Carrier's continued use of ECIMOS's protected intellectual property despite judicial prohibition, and its acknowledgment that production lines would have to shut down if deprived of ECIMOS's RES software and database, exemplify the entrenched nature of trade-secret theft in this sector. These findings underscore that misappropriation within the HVAC industry is not isolated but systemic, warranting heightened scrutiny. Accordingly, Plaintiff respectfully submits that, irrespective of settlement, the Court should consider referral of this matter to the United States Department of Justice for review under the Economic Espionage Act, 18 U.S.C. § 1831 et seq., to ensure that any criminal implications arising from the unauthorized use of IPCS trade-secret materials are properly evaluated by the appropriate authorities.

Specifically, Plaintiff requests that:

Maurice Powers (IT Director) be held liable for participating in or directing the adaptation and implementation of IPCS-derived ERP functionality, including work-order ingestion, Bill-of-Materials extraction, inventory-relief functionality, shipment-authorization controls, and PackOut Watchdog-related ERP processes used within the Serv-I-Quip Production Line.

Amanda Christensen (Electrical Assembler Lead) be held liable for knowingly accessing IPCS geothermal test procedures, supervisory-level configurations, test-result datasets, and other protected IPCS functionality beyond the scope of ordinary production-level responsibilities.

Jesse Shaw (ERP Integration / IT) be held liable for implementing or adapting IPCS-derived stored-procedure logic, ERP-integration functionality, work-order processing, Bill-of-Materials extraction, serial-number verification processes, shipment-authorization controls, and related PackOut Watchdog functionality within the Serv-I-Quip Production Line.

Kevin Weis (Operations Engineer) be held liable for interpreting and utilizing IPCS wiring schematics, control-signal architecture, electrical-validation systems, model-verification procedures, AutoTest functionality, and other engineering-level IPCS technologies incorporated into the Serv-I-Quip geothermal testing platform.

Kevin Schrank (QC Manager / Manufacturing Manager) be held liable for supervising or implementing IPCS-derived geothermal test procedures, quality-control checkpoints, compliance-gating requirements, refrigeration-system validation procedures, and production-release criteria associated with the Serv-I-Quip Production Line and the PackOut Watchdog "Final" station.

Dylan O'Keefe (Production Supervisor) be held liable for supervising or implementing IPCS-derived production-line workflow, geothermal test sequences, manufacturing-process logic, compliance-gating procedures, and operational requirements associated with transition of units through the Serv-I-Quip Production Line.

Jill Lauchner (Director of Human Resources) be held liable for failing to implement, document, monitor, or enforce Clean Room separation requirements and for permitting reassignment of employees possessing IPCS-derived knowledge to activities associated with development and implementation of the Serv-I-Quip Production Line without adequate intellectual-property safeguards.

Robert Powers (IT Technician) be held liable for unauthorized access to IPCS-protected systems, circumvention of KeyLok technological protection measures, use of protected supervisory credentials, manipulation of encrypted IPCS key data, and other conduct constituting violations of 17 U.S.C. § 1201(a)(1) and § 1201(a)(2).

Plaintiff further requests that the Court award statutory damages, actual damages, exemplary damages, and disgorgement of profits against each individual defendant commensurate with their degree of participation and willfulness, and that such liability not be indemnified or reimbursed by Enertech Global, LLC.

Plaintiff further requests that, for purposes of determining disgorgement and unjust enrichment, the Court require each individual defendant to disclose all compensation, bonuses, and other financial benefits received from Enertech Global, LLC from the date Enertech initiated requests for quotation with Serv-I-Quip and Epicor through the present. Plaintiff requests that such compensation be examined to determine the extent to which it was derived from, or enhanced by, the unauthorized use of IPCS technology. Each defendant should bear the burden of demonstrating what portion of their compensation was earned for non-infringing activities unrelated to IPCS-derived systems. Any remaining amount attributable to infringing conduct should be subject to disgorgement under 17 U.S.C. § 504(b) and 18 U.S.C. § 1836(b)(3)(B).

Plaintiff further requests that, pursuant to 17 U.S.C. § 504(b), 18 U.S.C. § 1836(b)(3)(B), and 17 U.S.C. § 1203(c)(3)(A), the Court order that any monetary judgment, including disgorgement of profits, statutory damages, and exemplary damages, be satisfied personally by each individual defendant from their own assets, earnings, or accounts. Plaintiff requests that Enertech Global, LLC be prohibited from indemnifying, reimbursing, or otherwise covering such payments, ensuring that each defendant bears direct financial responsibility for their participation in the infringement and misappropriation of Plaintiff's IPCS technology.

Plaintiff further requests that, in determining disgorgement of profits under 17 U.S.C. § 504(b), the Court apply a proportional apportionment methodology based upon the relative

contribution of IPCS-derived functionality to Enertech's geothermal manufacturing operations. Plaintiff requests that Enertech Global, LLC be required to produce its gross revenue for the relevant period of unauthorized use, after which the burden shall shift to Enertech to establish any deductible costs or non-infringing profit components.

Plaintiff further requests that Enertech be required to disclose the total number of production-line computers, workstations, terminals, controllers, or other computerized systems utilized in its geothermal manufacturing operations during the relevant period, together with identification of those systems performing IPCS-derived functionality. Plaintiff alleges that the IPCS-derived functionality identified in Paragraph 25 was implemented across multiple dedicated production-line computers performing manufacturing-control, testing, quality-control, ERP-integration, reporting, traceability, compliance-gating, and shipment-authorization functions.

Plaintiff further requests that the Court instruct the jury to determine the portion of Enertech's profits attributable to IPCS-derived functionality by comparing the number, function, and relative significance of IPCS-derived production-line operations to the total computerized operations utilized within Enertech's geothermal manufacturing environment.

Such analysis may include, without limitation, the relative contribution of IPCS-derived production-line computers, operational functions, test systems, compliance-gating systems, reporting systems, ERP-integration systems, and shipment-authorization controls to the manufacture and sale of Enertech products.

This methodology ensures that profits attributable to IPCS-derived functionality, including manufacturing-control operations, geothermal testing procedures, ERP-integration logic, stored-procedure interfaces, reporting systems, traceability functions, and PackOut Watchdog-equivalent shipment-authorization functionality, are disgorged in proportion to their contribution to Enertech's revenue-producing manufacturing activities, consistent with 17 U.S.C. § 504(b) and 18 U.S.C. § 1836(b)(3)(B).

Plaintiff further requests that the Court instruct the jury to determine whether any continuing post-verdict use of IPCS-derived functionality should be subject to the same proportional apportionment percentage established by the jury for purposes of profit disgorgement. Plaintiff further requests that, if the jury determines that IPCS-derived functionality contributes a measurable portion of Enertech's revenue-producing manufacturing operations, that proportional percentage be applied to any profits subsequently earned through continued use of such functionality until Defendants demonstrate complete cessation of use or compliance with any injunctive relief entered by the Court.

---

Plaintiff further requests that any proportional apportionment percentage established by the jury for purposes of profit disgorgement remain in effect and continue to govern any post-verdict disgorgement of profits attributable to IPCS-derived functionality unless and until modified by further order of the Court.

Plaintiff further requests that the Court establish the starting date for all disgorgement calculations—both corporate profits and individual compensation—as the earliest date on which Enertech Global, LLC provided a Request for Quotation (RFQ) to either Serv-I-Quip, Inc. or Epicor Software Corp. for development or integration of geothermal production-line systems. Plaintiff requests that the Court compel Enertech Global, LLC to produce copies of both RFQ documents to determine which occurred first and to serve as the evidentiary benchmark for the commencement of unauthorized use. This starting date shall govern the period for which profits are subject to disgorgement under 17 U.S.C. § 504(b) and 18 U.S.C. § 1836(b)(3)(B), and shall likewise define the period for which each individual defendant's compensation, bonuses, and other financial benefits are examined for unjust enrichment. This methodology parallels the statutory requirement under U.S. Copyright law that the infringer's profits be supplied from the inception of infringing activity and ensures consistent temporal alignment between corporate and individual liability.

Plaintiff further requests that the Court instruct Defendant Enertech Global, LLC to produce the complete Purchase Order documents issued to Serv-I-Quip, Inc. and Epicor Software Corp. corresponding to the Requests for Quotation referenced above. These Purchase Orders shall be provided in unredacted form, including all cost and line-item details, to enable the jury to assess actual damages and determine the economic value of the production-line expansion that duplicated functionality embodied within

Plaintiff's IPCS technology. Plaintiff asserts that, had Enertech not engaged in unauthorized duplication of IPCS technology, Plaintiff would have received the order for the additional production line used to increase Enertech's manufacturing capacity.

Plaintiff acknowledges that certain line items on the Epicor Purchase Order may not translate into damages directly attributable to IPCS-derived functionality; however, full disclosure of all cost components is necessary to permit accurate apportionment and to satisfy the evidentiary requirements of 17 U.S.C. § 504(b) for determination of profits and actual damages from the inception of infringing activity.

Plaintiff further requests that the Court grant such additional relief as may be just and proper, including pre- and post-judgment interest, recovery of reasonable litigation costs and travel expenses incurred in connection with required appearances, and continuing jurisdiction to enforce compliance with all injunctive and monetary orders entered herein.

Plaintiff further requests that the Court consider that improper designation of a corporate representative who is also a fact witness or individual defendant may create substantial prejudice and raise issues appropriate for appellate review. Plaintiff therefore respectfully requests that the Court impose reasonable limitations on Enertech's designation to ensure compliance with Rule 30(b)(6), preserve the integrity of witness sequestration, and avoid the risk of reversible error.

Plaintiff further requests that, for purposes of trial presentation, witness examination, exhibits, jury instructions, and all proceedings before the jury, the Court require the parties to employ neutral nomenclature when referring to the manufacturing systems at issue in this action.

Plaintiff submits that characterization of the disputed manufacturing system as the "Serv-I-Quip Production Line," or similar terminology assumes and conveys disputed facts regarding the origin, authorship, ownership, and development of the functionality implemented within that system. Plaintiff further submits that the central issue in this litigation is whether the functionality embodied within the disputed system was independently developed or instead incorporates, derives from, or reproduces functionality originating from Plaintiff's IPCS technology. The use of terminology attributing the disputed system to a particular third party therefore risks unfair prejudice and may improperly suggest conclusions regarding disputed factual issues reserved for determination by the jury.

Plaintiff further submits that terms such as "competitor line," "competing system," or similar nomenclature are likewise non-neutral because they implicitly suggest independent development and ownership by a third party, which are disputed factual issues that remain to be determined through the evidence presented at trial.

Plaintiff further submits that terms such as "replacement line" or "replacement system" are likewise non-neutral because they implicitly assume that the disputed system was developed and implemented for the purpose of replacing the IPCS Production Line.

Plaintiff alleges that the disputed system operated contemporaneously with the IPCS Production Line prior to decommissioning of the IPCS Production Line and that the circumstances under which it later became the sole operating production system remain disputed issues in this litigation. Plaintiff further alleges that the disputed system did not become the sole operating production system until after the sequence of events described herein, including Plaintiff's expression of concerns regarding unauthorized activity involving IPCS technology, Plaintiff's request to inspect the IPCS Production Line, the communications that followed, and the subsequent decommissioning of the IPCS Production Line. Whether the disputed system was originally conceived, developed, or implemented as a replacement system therefore remains a disputed factual issue for determination by the jury.

Plaintiff further notes that the functionality identified throughout this Complaint includes manufacturing-control operations, geothermal test procedures, ERP-integration methodologies, traceability functions, reporting structures, compliance-gating processes, and other technologies developed and implemented by Plaintiff over multiple decades within the HVAC/R industry. Plaintiff further notes that the Integrated Process Control System ("IPCS") originated as an HVAC/R industry manufacturing platform and was implemented, marketed, and continuously refined across multiple manufacturing environments long before its adoption by Enertech. The IPCS designation itself was

established in 1993 following industry deployment of the technology and was coined by an independent marketing consulting firm retained to assist in branding Plaintiff's manufacturing-control technology. The designation reflects a product identity independent of any particular manufacturer, customer, or subsequent user of the technology.

Plaintiff further notes that IPCS was implemented, marketed, and continuously refined across multiple HVAC/R manufacturing environments, including geothermal manufacturing operations predating Enertech's acquisition of the Econar geothermal product line, underscoring that IPCS originated as an industry platform rather than a manufacturer-specific system.

Whether such functionality was independently developed by any third party or instead derives from Plaintiff's IPCS technology remains a question reserved for determination by the jury.

Plaintiff further notes that, were Plaintiff permitted to characterize the same system using terms such as "cloned line," "duplicated line," "infringing line," or similar terminology, Defendants would appropriately object that such descriptions improperly assume facts not yet adjudicated. Plaintiff respectfully submits that the same principle of neutrality should apply equally to all parties.

Plaintiff further submits that terms such as "Serv-I-Quip Production Line," "Serv-I-Quip Line," "competitor line," "competing system," "replacement line" and "replacement

system" or similar nomenclature should not be presented to the jury because each implicitly attributes authorship, ownership, independent development, or competitive status, or replacement status to functionality whose origin remains a disputed factual issue in this action. Plaintiff respectfully submits that such terminology risks prejudicing the jury by embedding contested factual conclusions within the labels used to identify the manufacturing systems at issue.

Accordingly, Plaintiff requests that the Court require use of neutral designations such as "Line 1" and "Line 2," or "IPCS Production Line" and "Line 2," unless and until the evidence establishes a more appropriate designation. Plaintiff further submits that numbered line designations are commonly utilized throughout manufacturing environments, do not imply ownership, authorship, infringement, or independent development, and therefore provide the least prejudicial means of identifying the production systems at issue.

Plaintiff further requests that the Court require Defendant Enertech Global, LLC to designate a corporate representative pursuant to Fed. R. Civ. P. 30(b)(6) who is drawn from Enertech's corporate offices and corporate management team, and who is not an individual defendant or fact witness in this matter. Plaintiff requests this limitation to prevent circumvention of witness sequestration rules and to avoid the unfair prejudice that

would result if a key fact witness were permitted to hear all testimony during trial under the exemption afforded to corporate representatives.

Plaintiff further notes that Defendant Maurice Powers personally informed Plaintiff that he had been reassigned to work exclusively with Enertech's Manufacturing Department for approximately one year, despite acknowledging that he was "really an IT guy" and not manufacturing-versed. This admission demonstrates that Mr. Powers was directly embedded in the production-line environment where IPCS-derived materials were accessed, duplicated, and implemented, making him a central fact witness to the infringing conduct rather than a corporate-level decision-maker. Because Mr. Powers lacks corporate-office responsibilities and possesses firsthand knowledge of the unauthorized use of IPCS technology, his designation as Enertech's corporate representative would circumvent witness sequestration, permit exposure to all trial testimony, and create substantial prejudice. Plaintiff therefore requests that the Court preclude Enertech from designating Mr. Powers as its Rule 30(b)(6) representative, as such designation would improperly merge the roles of fact witness and corporate spokesperson and risk reversible error. Plaintiff further submits that no individual defendant or material fact witness possessing firsthand knowledge of the events at issue should be designated as Defendant Enertech Global, LLC's Rule 30(b)(6) representative, because such designation would improperly merge the roles of fact witness and corporate spokesperson, undermine

witness sequestration, and create a substantial risk of prejudice to the integrity of the proceedings.

Plaintiff further asserts that additional Enertech personnel, including Defendant Kevin Weis (Operations Engineer) and Defendant Dylan O'Keefe (Production Supervisor), were reassigned from their normal duties to work closely with Serv-I-Quip project managers in interpreting Plaintiff's IPCS drawings and operating logic for the LeakProof Station, VacuCharge, Final Leak, and AutoTest performance tester, four IPCS-controlled production-line operations. Concurrently, Defendant Jesse Shaw (ERP Integration / IT) and Defendant Maurice Powers (IT Director) were assigned to collaborate with Epicor on adapting Plaintiff's ERP Bill-of-Material stored-procedure extractions for additional IPCS-controlled production-line operations. These coordinated assignments demonstrate that Enertech's management deliberately embedded IPCS-derived expertise into both the Serv-I-Quip and Epicor systems, further supporting Plaintiff's contention that the company's integration activities constituted unauthorized use of IPCS technology.

Because each of these individuals possesses firsthand knowledge of the infringing conduct and participated directly in the adaptation of IPCS-derived materials, Plaintiff

respectfully requests that the Court likewise preclude Enertech Global, LLC from designating Kevin Weis, Dylan O'Keefe, Jesse Shaw, or Maurice Powers as corporate representatives under Fed. R. Civ. P. 30(b)(6). Their involvement as fact witnesses renders them unsuitable to serve as corporate spokespersons, and such designation would improperly merge testimonial roles, compromise witness sequestration, and risk reversible error.

To ensure compliance with sequestration and maintain the integrity of testimony, Plaintiff proposes that the Court temporarily prohibits the individual defendants from reporting to their respective Enertech facilities during the trial period. The defendants are expected to continue working side-by-side at Enertech's Greenville, Illinois headquarters and Mitchell, South Dakota factory, where daily interactions in shared spaces such as break rooms and production areas would allow them to coordinate or influence each other's testimony. Plaintiff respectfully asserts that such circumstances undermine the independence of witness recollection and risk contaminating the evidentiary record. Should the Court deem it necessary to mitigate financial hardship, Plaintiff further recommends that Enertech Global, LLC be permitted to continue compensating these employees during their absence, provided that such payments are not used to influence testimony or trial participation. This approach would safeguard the fairness of proceedings while preventing ongoing exposure to corporate influence and coordinated witness communication.

Plaintiff further asserts that Enertech Global, LLC maintained a dedicated employee stationed at the end of its geothermal assembly line whose responsibility was to execute Plaintiff's IPCS-generated "Unit Report Card" reports and secure them electronically for Enertech's records. Each geothermal unit shipped since 2014 underwent multiple sequential IPCS-controlled production-line operations, each producing performance and ERP-integration data through Plaintiff's copyrighted ECIMOSsqlToExcel.xlsx workbook. These reports attached by serial number critical component data—including compressor serial and model numbers verified against the ERP Bill of Material—demonstrating that Enertech systematically relied on Plaintiff's IPCS technology for production verification and quality control.

Plaintiff asserts that Enertech Global, LLC continues to view and utilize IPCS-generated "Unit Report Card" reports in its production and quality-control operations. Plaintiff further asserts that Enertech, Serv-I-Quip, and Epicor likely replicated the IPCS reporting and ERP-integration structure by referencing Plaintiff's copyrighted ECIMOSsqlToExcel.xlsx workbook and its multi-tab performance schema as a design guide for IPCS-controlled operations implemented across dedicated production-line computers. Plaintiff requests that the Court compel full disclosure of any such derivative materials and require Defendants to produce all corresponding documentation evidencing continued use or adaptation of IPCS-derived reporting structures.

Plaintiff anticipates that Defendants may assert, as in the Carrier precedent, that the data contained within the IPCS reports belongs to Enertech because it pertains to their manufactured units.

Plaintiff respectfully distinguishes that argument by noting that the geothermal units themselves did not generate the reports or measurements; they merely produced physical energy-consumption and thermodynamic conditions. Enertech does not own the number "74" that its customers read on a Johnson Controls, Inc. digital thermostat; it owns only the physical unit, not the measurement or the reporting logic that interprets it—and Johnson Controls, Inc. owns the technology that displays the "74." The IPCS system, through its proprietary algorithms and integration logic, converted those physical conditions into digital performance metrics and structured reports used to verify that each Enertech unit successfully met AHRI performance ratings. Accordingly, the copyrighted report format, data organization, and integration methodology remain the intellectual property of Plaintiff.

Plaintiff further notes that during Enertech's transition from Infor SyteLine to the Epicor ERP system, Defendant Maurice Powers repeatedly sought Plaintiff's assistance in adapting IPCS interfaces to Epicor and requested instruction on the stored-procedure integration logic previously developed for SyteLine. Plaintiff asserts that this instruction was provided so that Enertech personnel, including Jesse Shaw, could replicate IPCS's Bill-of-Material extraction and work-instruction integration within Epicor's CM module for use on the new Serv-I-Quip production line. The ruse presented to Plaintiff was that the

Olita IPCS production line was merely being converted from SyteLine to Epicor; however, Maurice Powers and Jesse Shaw used that process to apply Epicor in its entirety to the Serv-I-Quip production line, thereby obtaining IPCS integration knowledge under false pretenses. Plaintiff unwittingly cooperated with this infringement by providing technical guidance believed to be for Enertech's legitimate ERP migration. The sequence of events indicates that IPCS's proprietary integration methodology was used as a functional template for configuring Epicor's work-instruction and production-routing features, thereby enabling Enertech to maintain IPCS-derived functionality after migrating to Epicor and implementing the Serv-I-Quip line.

Plaintiff further requests that the Court specifically enjoin Defendants, their field-service personnel, contractors, and affiliates from accessing, viewing, or utilizing any IPCS-derived "Unit Report Card" reports, templates, or data structures in connection with geothermal unit servicing, diagnostics, or warranty operations. Plaintiff asserts that continued use of these reports constitutes ongoing infringement and irreparable harm, as each instance of access or reliance upon IPCS-generated materials perpetuates unauthorized exploitation of Plaintiff's copyrighted reporting system. Plaintiff therefore requests that the Court order

Enertech Global, LLC to cease all operational and field-service use of IPCS-derived reports and to implement internal controls preventing further dissemination or reference to such materials.

Plaintiff further requests that the Court specifically enjoin Defendant Enertech Global, LLC from accessing, distributing, or utilizing any "Report Card" or similar reporting output generated by the Serv-I-Quip Production Line that incorporates or references Plaintiff's IPCS technology, including the ECIMOSsqlToExcel.xlsx workbook and its eleven-tab performance schema. Plaintiff asserts that Enertech's continued use of Serv-I-Quip-generated "Report Card" reports constitutes ongoing infringement and derivative exploitation of IPCS-derived materials. Plaintiff therefore requests that the Court order Enertech Global, LLC to cease all use, storage, or reliance upon Serv-I-Quip-generated "Report Card" reports and to implement internal controls preventing further dissemination or reference to such materials.

Plaintiff further states that Serv-I-Quip, Inc. and Epicor Software Corporation are not presently named as defendants in this action. References to Serv-I-Quip and Epicor are included solely to describe their alleged involvement in the development, implementation, marketing, licensing, or commercial exploitation of technology and functionality alleged herein to derive from Plaintiff's IPCS intellectual property. Plaintiff presently seeks relief against the named Defendants and does not seek affirmative monetary recovery from Serv-I-Quip or Epicor in this action. Plaintiff further requests that the Court permit adjudication

of Plaintiff's claims against the named Defendants without requiring compulsory joinder of Serv-I-Quip or Epicor, as complete relief may be afforded between the existing parties and because compulsory expansion of this litigation would impose substantial and disproportionate burdens upon a financially constrained pro se litigant. Plaintiff further reserves all rights concerning any future claims against Serv-I-Quip, Epicor, or any other person or entity should discovery reveal additional facts warranting such action.

Plaintiff further notes that, even if the Court were to determine that participation by Serv-I-Quip, Inc. or Epicor Software Corporation is necessary for adjudication of certain issues, Plaintiff presently seeks primarily injunctive and declaratory relief directed toward preventing continued use, marketing, licensing, sale, or commercial exploitation of technology alleged herein to derive from Plaintiff's IPCS intellectual property. Plaintiff does not presently seek monetary recovery from Serv-I-Quip or Epicor and reserves all rights concerning any future claims should discovery reveal additional facts warranting such action.

Plaintiff further requests such other and further relief as the Court deems just and proper.

**DMCA-Specific Relief Under 17 U.S.C. § 1203**

Plaintiff requests all remedies authorized under 17 U.S.C. § 1203 for Defendants' multiple acts of circumvention of technological protection measures in violation of 17 U.S.C. § 1201(a)(1) and (a)(2), including:

1. Statutory damages for each act of circumvention, as permitted by § 1203(c)(3)(A), in an amount of $2,500 per violation for the deliberate and repeated circumvention acts committed by Defendant Robert Powers personally, and not less than $200 per violation for each additional circumvention act attributable to Enertech Global, LLC through its employees and agents.

2. Actual damages and profits under § 1203(c)(2), including disgorgement of all profits derived from unauthorized access, use, duplication, or manipulation of Plaintiff's protected IPCS technology.

3. Injunctive relief under § 1203(b)(1), prohibiting Defendants from further bypassing, altering, or defeating Plaintiff's KeyLok access-control system, encryption layers, supervisory-credential gates, or any other technological protection measures.

4. Impoundment and destruction under § 1203(b)(2) and (b)(6) of all devices, servers, copies, or derivative works used in or resulting from Defendants' circumvention activities.

5. Recovery of costs under § 1203(c)(4), including reasonable litigation expenses and travel required for depositions, hearings, and on-site inspections.

6. Any additional relief the Court deems just and proper under § 1203(b)(5), including continuing jurisdiction to enforce compliance with all injunctive and monetary orders entered herein.

Plaintiff further requests such other and further relief as the Court deems just and proper.

# VIII. JURY DEMAND

Plaintiff demands a jury trial on all issues so triable.

Respectfully submitted,

Stephen G. Olita

Stephen G. Olita 8/12/2026

Pro Se Plaintiff

Orlando, Florida

901-490-8044 steve.olita@ecicomplete.com

PRESS FIRMLY TO SEAL

FSC MIX Board FSC® C116916

PAPER POUCH how2recycle.info

PRESS FIRMLY TO SEAL

UNITED STATES POSTAL SERVICE. Retail

E

US POSTAGE PAID

$35.90

Origin: 32819
08/12/26
1169390817-14

PRIORITY MAIL EXPRESS®

STEPHEN G OLITA
9821 CAMBERLEY CIR
ORLANDO FL 32836-5748
(901) 490-8044

1 Lb 0.10 Oz

RDC 07

SIGNATURE REQUIRED

SCHEDULED DELIVERY DAY: 08/13/26 06:00 PM

C033

SHIP TO:

(605) 330-6600
US DISTRICT OF SOUTH DAKOTA
400 S PHILLIPS AVE
SIOUX FALLS SD 57104-6848

USPS SIGNATURE® TRACKING #

9581 7152 6386 6224 1142 36

# PRIORITY MAIL EXPRESS®

This package is made from post-consumer waste. Please recycle - again.

## FLAT RATE ENVELOPE

ONE RATE ■ ANY WEIGHT

FOR DOME...
PLA...

- Guarante...
- Guarante...
- USPS Tra... and many...
- Pick up a...
- Domestic... (restrictio...
- Signature...

*Money Back... select Intern... See DMM an...

**Insurance do... claims exclu... http://pe.usp...

†Money Back...

WHEN USED INTE...

To schedule free Package Pickup, scan the QR code.

USPS.COM/PICKUP

PS10001000006

EP13F October 2023
OD: 12 1/2 x 9 1/2

PAPER POUCH how2recycle.info

UNITED STATES POSTAL SERVICE U.S. MAIL

UNITED STATES POSTAL SERVICE®

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail Express® shipments. Misuses may be a violation of federal law. This package is not for resale. EP13F © U.S. Postal Service; October 2023; All rights reserved.

UNITED STATES POSTAL SERVICE®

PRIORITY MAIL EXPRESS®

EMS

X-RAYED B…
SOUT… …AKOTA

# FLAT RATE ENVELOPE

ONE RATE ■ ANY WEIGHT

To schedule free Package Pickup, scan the QR code.

USPS.COM/PICKUP

**VISIT US AT USPS.COM®**

ORDER FREE SUPPLIES ONLINE

PS10001000006

EP13F October 2023
OD: 12 1/2 x 9 1/2

**GUARANTEED* ▪ TRACKED ▪ INSURED**

For Domestic shipments, the maximum weight is 70 lbs. For international shipments, the maximum weight is 20 lbs.